UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Magistrate No.: 04-812M |
| | : | Criminal No.: |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| | : | 18 U.S.C. § 371 (Conspiracy); |
| GREGORY A. MOFFITT, | : | 18 U.S.C. § 2 (Aiding and Abetting) |
| | : | |
| Defendant. | : | |

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
(Conspiracy to Commit Securities Fraud)

**Relevant Persons and Entities**

At times material to this Information:

1.  Marc Duchesne was a citizen of the United Kingdom and resided in Houston, Texas.

2.  Nationwide Capital Corporation ("Nationwide") was a Nevada corporation with offices in Houston, Texas which had de minimus assets and revenues and virtually no business operations. In July 2002, Nationwide merged with Calwest Ventures Inc. ("Calwest"), a publicly traded "shell" company which also had no significant assets, income or business. The merger of Nationwide and Calwest occurred after Marc Duchesne and others had purchased virtually all of the outstanding shares of Calwest. At the conclusion of the merger, the surviving entity was Nationwide Capital Corporation.

3.  After the merger, Nationwide became a publicly traded company under the symbol "NCCN." Nationwide had common stock registered with the United States Securities and Exchange

Commission ("SEC") under the Securities Act of 1933, and from on or about August 16, 2002, through on or about October 1, 2002, the common stock of Nationwide traded on the electronic bulletin board system (the "OTC Bulletin Board") maintained by the National Association of Securities Dealers (the "NASD"). Nationwide was required by law to file with the SEC truthful statements regarding its business affairs, including periodic reports on its financial condition and operations. On October 1, 2002, the SEC suspended trading in Nationwide securities until October 15, 2002, citing questions about statements made by Nationwide concerning its business operations, business relationships, financial condition and its acquisition of another company.

4. Suisse Alliance Corporation ("Suisse Alliance") was a Nevada corporation controlled by Duchesne with an office in Houston, Texas.

5. Anglo-American Fund LLC ("Anglo-American Fund") was a Nevada corporation controlled by Duchesne which listed the same mailing address as a Florida business which provided office space.

6. Morgan West Financial Services PLC ("Morgan West") maintained a brokerage account at Morgan Stanley. Duchesne identified himself as a director of Morgan West and had trading authority over its brokerage account at Morgan Stanley.

7. J.H., a resident of Chattanooga, Tennessee, was the controlling principal of Nine Trees Corporation, a Nevada corporation, and was a co-schemer of Duchesne. Hayden helped to broker the acquisition of Calwest by Duchesne and others at Nationwide.

8. GREGORY MOFFITT, the defendant, was a resident of Houston, Texas, was the President and Chief Executive Officer of Nationwide and was a co-schemer of Duchesne.

9. C.P., a resident of Springfield, Virginia, was a relative of MOFFITT.

10. J.P., a resident of Houston, Texas, was a relative of MOFFITT.

11. J.M., a resident of Houston, Texas, was the President of the "Financial Services Division" of Nationwide and was a co-schemer of Duchesne.

12. R.P., a resident of Houston, Texas, was a commercial real estate broker and was a co-schemer of Duchesne. In or about June 2002, R.P. began to assist J.M., Duchesne and others associated with Nationwide with finding commercial office space for Nationwide.

13. Foreign entity #1 was a money management business located in the Dominican Republic.

14. Law firm #1 was a Colorado professional corporation owned by Colorado attorney D.B., who previously served as an escrow agent for Duchesne on certain business deals.

15. Time Capital Corporation was an offshore corporation that was created by defendant MOFFITT, J.M. and others and controlled by defendant MOFFITT.

16. Premier International Holdings, Inc. was an offshore corporation that was created and controlled by J.M.

17. Your Corner Office ("YCO") was a Houston based consulting firm.

18. The SEC was an agency of the United States located at 450 5th Street, N.W., Washington, D.C. and was responsible for protecting investors and maintaining the integrity of the securities markets. As such, the SEC had regulatory and civil enforcement authority over companies such as Nationwide, whose securities were traded on the OTC Bulletin Board, as well as the officers, directors, and employees of such companies, such as defendant MOFFITT and J.M.

## THE CONSPIRACY

19. From in or about May 2002, through in or about October 2002, in the District of Columbia and elsewhere, Duchesne, J.H., and defendant MOFFITT, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly did conspire, confederate, and agree together with each other to commit offenses against the United States, to wit, to commit:

(1) Securities Fraud, that is, Duchesne, J.H. and defendant MOFFITT, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ manipulative and deceptive devices and contrivances in violation of 17 C.F.R. § 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person in connection with the purchase and sale of securities, all in violation of 15 U.S.C. §§ 78j(b) and 78ff; and

(2) Wire Fraud, that is, Duchesne, J.H. and defendant MOFFITT, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to defraud, would and did transmit and cause to be transmitted by means of wire communications in interstate commerce, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343.

## GOAL OF THE CONSPIRACY

20. It was a goal of the conspiracy for Duchesne and co-schemers defendant Moffitt, J.H., J.M., and R.P. and others known and unknown to the Grand Jury: (1) to unlawfully enrich themselves by engaging in a scheme to control and fraudulently manipulate the price of Nationwide common stock to artificially high levels in order to facilitate the sale of Nationwide shares owned by Duchesne, J.H., defendant MOFFITT, J.M., R.P. and various nominees with profits determined

in whole or in part by the manipulation; and (2) to conceal these criminal activities from the SEC, the securities markets, and the actual and prospective investors in Nationwide common stock.

## MANNER AND MEANS OF THE CONSPIRACY

To further the objects and goals of the conspiracy, Duchesne, J.H., defendant MOFFITT and others known and unknown to the Grand Jury would and did use the following manner and means, among others:

21. On various dates between May 2002 and October 2002, Duchesne, J.H., defendant MOFFITT and other conspirators and co-schemers:

   a. gained control of a publicly traded shell company by secretly purchasing all of the outstanding common stock of the shell company and changing the name of the company to Nationwide;

   b. caused Nationwide to be publicly traded on the OTC Bulletin Board under the trading symbol "NCCN;"

   c. secretly gained control of virtually all of the free-trading shares of Nationwide common stock by: (1) utilizing nominee companies, offshore companies and other means; and (2) causing free-trading Nationwide stock to be issued in the names of certain entities without the knowledge or consent of the principals of those entities;

   d. caused Nationwide common stock to be issued in the names of certain off-shore companies that were created and controlled by co-schemers defendant MOFFITT and J.M. in order to disguise and conceal their interest in the stock from the SEC, the securities markets, and the actual and prospective investors in Nationwide.

   e. fraudulently restricted the public supply of Nationwide stock in order to prevent outsiders from obtaining Nationwide shares and thus enabled Duchesne and others to manipulate Nationwide common stock and drive its stock price to artificially high levels without risk that outsiders would sell the stock and deflate the price;

   f. used a fraudulent "matched order," that is a securities purchase or sale entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price, to set the initial market price at which Nationwide stock was traded;

g. manipulated the price of Nationwide stock by arranging for the execution of trades at prearranged prices and quantities between Duchesne, J.H., R.P., C.P. and others that were designed to create a false and misleading appearance of an active and rising market in Nationwide stock;

h. manipulated the price of Nationwide stock by arranging for a late-day purchase of Nationwide stock at an inflated price in order to raise the reported closing price of the stock (also known as "marking the close");

i. caused orders to be placed in a brokerage account for the purchase of Nationwide shares at inflated prices, and thereafter failed to cover the cost of these purchases, thereby: (a) causing the market to reflect an inflated price for Nationwide stock based upon fraudulent transactions that did not proceed to settlement; and (b) creating the false appearance of active trading in the stock;

j. caused Nationwide's website to publish and disseminate materially false and misleading information about Nationwide's business operations;

k. caused the dissemination of materially false and misleading information about Nationwide's business operations in a Power Point presentation that was attached to Nationwide's website and was distributed to prospective investors;

l. submitted and caused to be submitted periodic reports to the SEC which contained materially false and misleading information about Nationwide's business operations and its shareholders;

m. caused Nationwide to issue by wire a press release concerning its purported acquisition of YCO that contained false information about YCO's projected gross margins and earnings;

n. in order to conceal the conspiracy and criminal conduct from the SEC, the securities markets and investors, caused Nationwide to file periodic reports with the SEC that falsely disclosed the percentage of ownership and control of Nationwide stock by Duchesne and others including co-schemers defendant MOFFITT and J.M.;

o. caused a Form 13D Report to be filed with the SEC which falsely represented that Duchesne only owned 8.38 percent of the outstanding shares of Nationwide common stock.

**OVERT ACTS**

Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy and in order to carry out the objects thereof, Duchesne, J.H., defendant MOFFITT and others known and unknown to the Grand Jury committed the following overt acts, among others:

**Secret Control Over Nationwide's Free-Trading Shares**

22.     On or about July 23, 2002, Duchesne and others purchased the outstanding common stock of Calwest.

23.     On or about August 6, 2002, Duchesne and others changed Calwest's name to Nationwide.

24.     On or before August 16, 2002, Duchesne caused free-trading Nationwide common stock to be registered in the names of Suisse Alliance and Anglo-American Fund.

25.     On or before August 16, 2002, Duchesne caused free-trading Nationwide common stock to be registered in the names of foreign entity #1 and law firm #1.

26.     On or about August 16, 2002, Duchesne and others caused Nationwide common stock to became publicly traded on the OTC Bulletin Board under the ticker symbol "NCCN."

**Matched Orders and Prearranged Trades**

27.     On or about August 16, 2002, Duchesne and J.H. discussed by telephone a plan to have J.H. post an offer to sell 500 Nationwide shares at $9.35 per share, each well knowing said price in no way reflected the value of Nationwide common shares.

28.     On or about August 16, 2002, J.H. telephoned his broker and caused the broker to post a bid to sell 500 Nationwide shares at $9.35 per share.

29.     On or about August 16, 2002, Duchesne posted a matching bid to purchase 500 Nationwide shares at a price of $9.35 per share.

30.     On or about August 27, 2002, Duchesne asked J.H. over the telephone to buy 5,000 Nationwide shares at the price that Duchesne was offering those shares on the OTC Bulletin Board.

31.     On or about August 27, 2002, J.H. telephoned his broker and caused him to buy 4,500 Nationwide shares at prices ranging from $9.05 to $9.25.

32.     On or about August 27, 2002, Duchesne coordinated prearranged market trades between J.H. and others in which J.H. sold 6,900 Nationwide shares at prices ranging from about $4.75 to $9.

33.     On or about August 27, 2002, Duchesne and defendant MOFFITT instructed C.P. over the telephone to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

34.     On or about August 27, 2002, C.P. telephoned his broker and caused him to purchase 3,000 Nationwide shares at $9 per share.

35.     On or about August 27, 2002, Duchesne telephoned J.M.'s father, O.M., and instructed O.M. to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

36.     On or about August 27, 2002, O.M. telephoned his broker and caused him to purchase 2,000 Nationwide shares at $9.20 per share.

37.     On or about August 29, 2002, Duchesne instructed R.P. over the telephone to purchase Nationwide common stock in amounts and at prices dictated by Duchesne.

38. On or about August 29, 2002, R.P. telephoned his broker and caused him to buy a total of 800 shares of Nationwide common stock at prices ranging between $10.25 and $18.75 per share.

39. In or about August 2002, Duchesne telephoned J.P. and asked J.P. to post a bid to buy Nationwide common stock at a price of $8 or $9 per share.

40. In or about August 2002, Duchesne telephoned M.M., a securities broker, and asked if M.M.'s brokerage firm would "walk up the bid" on Nationwide common stock by posting an initial bid and then incrementally raising the bid price.

### Marking the Close

41. On or about August 27, 2002, Duchesne instructed J.H. by telephone to buy Nationwide stock at an inflated price near the end of the trading day.

42. On or about August 27, 2002, at or about 3:54 p.m., J.H. telephoned his broker and caused him to post a bid to buy 100 Nationwide shares at $9.25 per share.

### Other Fraudulent Purchases

43. On or about September 27, 2002, Duchesne telephoned a broker at Morgan Stanley and caused the broker to purchase thousands of Nationwide shares for Morgan West at prices ranging from $2.90 to $4.25 per share well knowing that he would not pay for these stock purchases.

44. On or about September 30, 2002, Duchesne falsely assured the Morgan Stanley broker during a telephone conversation that he would pay for the Nationwide shares he had caused the broker to purchase for Morgan West on September 27, 2002.

### Nationwide's Website and Power Point Presentation

45.     In or about July 2002, Duchesne and others including defendant MOFFITT created a Nationwide website that contained materially false information about Nationwide's purported business operations and resources and caused the false information on the website to be disseminated to prospective investors via the internet and interstate wires.

46.     In or about August 2002, Duchesne and others including defendant MOFFITT created and caused to be disseminated through Nationwide's website a Power Point presentation that contained materially false information about Nationwide's purported business operations and resources.

47.     In or about August 2002, Duchesne and others gave the false Power Point presentation to prospective investors in Nationwide.

### False Filings with the SEC

48.     On or about August 7, 2002, Duchesne and others including defendant MOFFITT prepared and caused to be filed with the SEC in the District of Columbia a form 8-K that contained materially false information about Nationwide's purported business operations and shareholders.

49.     On or about August 19, 2002, Duchesne and others including defendant MOFFITT prepared and caused to be filed with the SEC in the District of Columbia a quarterly report on form 10-QSB for the quarter ending June 30, 2002, that contained materially false information about Nationwide's shareholders.

### False Press Release

50.     On or about September 27, 2002, Nationwide prepared and caused to be issued by wire to the District of Columbia and elsewhere a press release announcing the acquisition of YCO

by a Nationwide subsidiary which contained materially false information about YCO's projected gross margins and earnings.

**(Conspiracy and Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 371 and 2).**

        KENNETH L. WAINSTEIN
        United States Attorney
        for the District of Columbia


By: _____
        DAVID CAREY WOLL, JR.
        Assistant U.S. Attorney
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 514-4250