FILED

OCT 2 5 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 06-262 (SEALED) |
| : | |
| v.    : | VIOLATIONS: |
| : | |
| : | 18 U.S.C. § 371 (Conspiracy); |
| GREGORY A. MOFFITT, : | 18 U.S.C. § 2 (Aiding and Abetting) |
| : | |
| Defendant. : | |

## STATEMENT OF THE OFFENSE

Pursuant to Fed.R.Cr.P. 11, defendant GREGORY A. MOFFITT agrees and stipulates as follows:

1. Marc Duchesne was a citizen of the United Kingdom and resided in Houston, Texas.

2. Nationwide Capital Corporation ("Nationwide") was a Nevada corporation with offices in Houston, Texas which had de minimus assets and revenues and virtually no business operations. In July 2002, Nationwide merged with Calwest Ventures Inc. ("Calwest"), a publicly traded "shell" company which also had no significant assets, income or business. The merger of Nationwide and Calwest occurred after Duchesne and others had purchased virtually all of the outstanding shares of Calwest. At the conclusion of the merger, the surviving entity was Nationwide Capital Corporation.

3. After the merger, Nationwide became a publicly traded company under the symbol "NCCN." Nationwide had common stock registered with the United States Securities and Exchange Commission ("SEC") under the Securities Act of 1933, and from on or about

August 16, 2002, through on or about October 1, 2002, the common stock of Nationwide traded on the electronic bulletin board system (the "OTC Bulletin Board") maintained by the National Association of Securities Dealers (the "NASD"). Nationwide was required by law to file with the SEC truthful statements regarding its business affairs, including periodic reports on its financial condition and operations. On October 1, 2002, the SEC suspended trading in Nationwide securities until October 15, 2002, citing questions about statements made by Nationwide concerning its business operations, business relationships, financial condition and its acquisition of another company.

4. GREGORY MOFFITT, the defendant, was a resident of Houston, Texas and was the President and Chief Executive Officer of Nationwide.

5. C.P., a resident of Springfield, Virginia, was a relative of MOFFITT.

6. J.P., a resident of Houston, Texas, was a relative of MOFFITT.

7. J.M., a resident of Houston, Texas, was the President of the "Financial Services Division" of Nationwide.

8. R.P., a resident of Houston, Texas, was a commercial real estate broker. In or about June 2002, R.P. began to assist Duchesne, J.M. and others associated with Nationwide with finding commercial office space for Nationwide.

9. Time Capital Corporation was an offshore corporation that was created by MOFFITT, J.M. and others and controlled by MOFFITT.

10. Premier International Holdings, Inc. was an offshore corporation that was created and controlled by J.M.

11. Your Corner Office ("YCO") was a Houston based consulting firm.

12.     The SEC was an agency of the United States located at 450 5th Street, N.W., Washington, D.C. and was responsible for protecting investors and maintaining the integrity of the securities markets. As such, the SEC had regulatory and civil enforcement authority over companies such as Nationwide, whose securities were traded on the OTC Bulletin Board, as well as the officers, directors, and employees of such companies, such as GREGORY MOFFITT and J.M.

13. After Nationwide common shares began trading on August 16, 2002, and with the assistance of others, Duchesne devised several schemes to manipulate Nationwide's stock price.

14.     As described below, MOFFITT, Duchesne and others conspired to and did manipulate Nationwide's stock price by, among other things: (1) causing Nationwide common stock to be issued in the names of certain off-shore companies that were created and controlled by GREGORY MOFFITT and J.M. in order to disguise and conceal their interest in the stock from the SEC, the securities markets, and the actual and prospective investors in Nationwide; (2) coordinating several prearranged trades and "matched orders" (that is, securities purchases or sales entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price) that were designed to create a false and misleading appearance of an active and rising market in Nationwide stock and to induce others to purchase shares; (3) disseminating materially false information about Nationwide's business operations in both its company website and in a Power Point presentation that was given to prospective investors; (4) making periodic filings with the SEC which contained materially false information about Nationwide and its shareholders; and (5) issuing a false press release about Nationwide's purported acquisition of YCO that included materially

false financial information.

### Creation of Offshore Accounts

15. In or about May 2002, Duchesne told MOFFITT and J.M. to create offshore companies to hold stock. At the time, J.M. had already created Premier International Holdings, Inc.

16. In or about June 2002, MOFFITT, J.M. and others created Time Capital Corporation for MOFFITT.

### Creation of Nationwide and Distribution of Stock

17. On or about July 23, 2002, Duchesne, defendant MOFFITT and others purchased the outstanding common stock of Calwest.

18. On or about August 6, 2002, Duchesne, defendant MOFFITT and others changed Calwest's name to Nationwide.

19. On or before August 16, 2002, Duchesne caused Nationwide common stock to be issued in the names of Time Capital Corporation and Premier International Holdings, Inc.

20. On or about August 16, 2002, Duchesne, defendant MOFFITT and others caused Nationwide common stock to became publicly traded on the OTC Bulletin Board under the ticker symbol "NCCN."

### Matched Orders and Prearranged Trades

21. On or about August 27, 2002, Duchesne and defendant MOFFITT instructed C.P. over the telephone to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

22. On or about August 27, 2002, C.P. telephoned his broker and caused him to

purchase 3,000 Nationwide shares at $9 per share.

23. On or about August 27, 2002, Duchesne telephoned J.M.'s father, O.M., and instructed O.M. to buy Nationwide common stock in an amount and at a price dictated by Duchesne.

24. On or about August 27, 2002, O.M. telephoned his broker and caused him to purchase 2,000 Nationwide shares at $9.20 per share.

25. In or about August 2002, Duchesne telephoned J.P. and asked J.P. to post a bid to buy Nationwide common stock at a price of $8 or $9 per share.

26. In or about August 2002, Duchesne telephoned M.M., a securities broker, and asked if M.M.'s brokerage firm would "walk up the bid" on Nationwide common stock by posting an initial bid and then incrementally raising the bid price.

### Nationwide's Website and Power Point Presentation

27. In or about July 2002, Duchesne, defendant MOFFITT and others created and caused to be disseminated on the internet a Nationwide website that contained materially false information about Nationwide's purported business operations and resources.

28. In or about August 2002, Duchesne, defendant MOFFITT and others created and caused to be disseminated through Nationwide's website a Power Point presentation that contained materially false information about Nationwide's purported business operations and resources.

29. In or about August 2002, Duchesne and others handed out the false Power Point presentation to prospective investors in Nationwide.

### False Filings with the SEC

30. On or about August 7, 2002, Duchesne, defendant MOFFITT and others prepared and caused to be filed with the SEC in the District of Columbia a form 8-K that contained materially false information about Nationwide's purported business operations and shareholders.

31. On or about August 19, 2002, Duchesne, defendant MOFFITT and others prepared and caused to be filed with the SEC in the District of Columbia a quarterly report on form 10-QSB for the quarter ending June 30, 2002, that contained materially false information about Nationwide's shareholders.

### False Press Release

32. On or about September 27, 2002, Nationwide prepared and caused to be issued by wire to the District of Columbia and elsewhere a press release announcing the acquisition of YCO by a Nationwide subsidiary which contained materially false information about YCO's projected gross margins and earnings.

### The SEC's Investigation

33. The SEC is responsible for enforcing the federal securities laws, including the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*

34. Beginning in or about 2002, the SEC commenced a proceeding and directed its staff to investigate whether Nationwide and others, directly or indirectly, in connection with the offer, purchase or sale of securities: (i) may have employed, or was employing, devices, schemes, or artifices to defraud; (ii) may have made, or was making, untrue statements of material facts; or may have omitted, or was omitting, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and

may have obtained, or was obtaining, money or property by means of such statements or omissions; or (iii) may have engaged in, or was engaging in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers or other persons through, among other things, company press releases, statements on the Internet web site, and other public statements concerning, among other things: (a) the company's business operations, (b) the company's business relationships, (c) the company's current financial condition, (d) the company's acquisition of YCO, a privately held company, and (e) trading in the company's common stock by related shareholders.

35. As its investigation progressed, it was material to the SEC to determine, among other things: (1) whether defendant MOFFITT knew C.P.; (2) whether defendant MOFFITT had in any way influenced C.P.'s decision to purchase Nationwide stock; (3) whether defendant MOFFITT had spoken to C.P. about purchasing Nationwide stock prior to C.P's purchase of Nationwide stock on August 27, 2002; (4) the substance of any discussion between defendant MOFFITT and C.P. about purchasing Nationwide stock; (5) whether Duchesne, defendant MOFFITT and others including C.P. had attempted to artificially increase the price of Nationwide common stock by prearranging trades of Nationwide stock by and between Duchesne, C.P. and others; (6) whether Nationwide's press release concerning the acquisition of YCO contained false information; and (7) what percentages of Nationwide common stock were owned or controlled by Duchesne, defendant MOFFITT and others.

36. On or about August 29, 2002, MOFFITT made false and misleading statements to the SEC during an investigative interview that the SEC conducted by telephone from the District of Columbia. Specifically, when asked by the SEC, MOFFITT denied knowing C.P., his

relative.

Respectfully submitted,

KENNETH L. WAINSTEIN
United States Attorney
for the District of Columbia

By: _____
DAVID CAREY WOLL, JR.
Assistant U.S. Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-4250

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense.

Date: 10/25/2006          _____
                          Gregory A. Moffitt
                          Defendant

I have discussed this Statement of Offense with my client, Mr. Moffitt. I concur with his decision to stipulate to this Statement of Offense.

Date: 10/25/06           _____
                          Jonathan Jeffress, Esquire
                          Attorney for Gregory A. Moffitt

8